**DAWSON et al. v. MALONE et al.   (No. 3213.)**

(Court of Civil Appeals of Texas. Texarkana. April 8, 1926. Rehearing Denied April 15, 1926.)

**1. Customs and usages ⬳13.**

When a universal custom is shown to have existed, sale is prima facie presumed to have been on that basis, parties not having specially contracted otherwise.

**2. Customs and usages ⬳13—Custom of having weight and quality of shipment of cotton seed ascertained at mill of buyer and gross price then determined, intended to be part of agreement, is binding, rendering seller liable for damage resulting from failure to conform to it.**

Where parties to sale of cottonseed intend custom of having weight and quality ascertained at mill of buyer and gross price then determined to be part of agreement, custom is binding, and renders seller liable for loss or damage resulting from failure to conform to it, and excuses him when loss or damage is not attributable to an observance of it.

**3. Customs and usages ⬳21.**

Intention of parties to contract, with reference to making an established custom a part thereof, is a question of fact for jury.

**4. Sales ⬳200(3)—Sale of cottonseed, to be inspected by buyer to determine aggregate price on its arrival at his place of business, is incomplete until buyer had determined or had opportunity to determine that shipment is as contracted.**

Contract for sale of cottonseed at buyer's place of business, where buyer was privileged to inspect shipment to determine aggregate price, is a contract of sale on condition precedent, sale being incomplete until buyer determines or has reasonable opportunity to determine that shipment is as contracted.

**5. Sales ⬳202(5)—That buyer paid draft and secured bill of lading for delivery to railway while car was in railway yards at destination held not to constitute delivery and "acceptance" of shipment.**

That buyer paid draft and secured bill of lading for delivery to railroad company while car of cottonseed was in railroad yards at destination, before being switched to industrial tracks, did not constitute delivery and "acceptance" of shipment, unless buyer intended to

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

(283 S.W.)

accept shipment, which implies actual taking with intention of retaining.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Acceptance.]

**6. Sales** ⚙═201(4)—**Circumstances held to show that buyer obtaining bill of lading and delivering it to railway did not intend to take and retain shipment.**

Circumstances *held* to show that buyer obtaining bill of lading and delivering it to railway to facilitate placing of car on industrial tracks in accordance with rules of railway and in virtue of contract of shipment did not intend to take and retain shipment while car was in general yards of railway.

**7. Sales** ⚙═197—**As between buyer and seller, title and risk remain in seller until delivery of shipment in accordance with contract, intention of parties so appearing.**

As between buyer and seller, in absence of change or modification of place or manner of delivery, title and risk remain in seller until shipment is delivered in accordance with contract, the intention of parties so appearing.

**8. Sales** ⚙═391(7)—**Buyer may refuse to receive shipment contracted to be sound and dry at point of delivery if it is not then in an acceptable state and sue for price advanced as money had and retained.**

Where it was a condition precedent to transfer of property in shipment that cottonseed be sound and dry, seller failed to perform agreement unless cottonseed was in such state, and buyer could refuse to receive shipment and sue for price advanced as. in nature of money had and retained, though he took and retained bill of lading.

**9. Sales** ⚙═404—**Buyer may sue seller only for damage to shipment contracted to be delivered sound and dry, though damage was caused by negligence of railway.**

Where shipment of cottonseed required by contract to be delivered in sound and dry condition was damaged by negligence of railway, buyer could elect to sue seller only for resulting damage by virtue of the contract.

**10. Venue** ⚙═7—**County at point of delivery of shipment held proper venue for action for damages for breach of contract.**

In buyer's action for damages for breach of contract of shipment, county at point of delivery where contract was to be performed was proper venue.

Appeal from Harris County Court; Murray B. Jones, Judge.

Suit by James D. Dawson and others, doing business under the name of the Fidelity Products Company, against W. R. Malone and others, doing business as the Willis Gin Company. Judgment for defendants, and plaintiffs appeal. Reversed and rendered.

The appellants, as partners under the name of Fidelity Products Company, brought the suit against W. R. Malone, A. H. Inglet, and

S. J. Inglet, as partners under the tradename of Willis Gin Company, for damages for breach of an alleged contract of shipment of a carload of cottonseed. It is alleged that:

The "defendants agreed to deliver to plaintiffs at Houston, Tex., a carload of prime cottonseed, sound and dry and clean, same to be paid for by plaintiffs upon presentation to plaintiffs at Houston, Tex., of a draft with bill of lading attached at the rate of $48 per ton, basis Willis. That under a well-established custom in the trade, which custom was well known to defendants and plaintiffs herein, and which custom entered into said contract, the defendants agreed to deliver to plaintiffs in Houston, Harris county, Tex., and at their mill, one carload of prime cottonseed, sound and dry and clean and in good condition, at the agreed price of $48 per ton, basis Willis. That it was a universal and well-established custom of the trade, well known to plaintiffs and defendants, that the weight and quality of a shipment of this nature was guaranteed at destination by the shipper, and that this custom entered into this contract."

As alleged, the defendants "shipped a car of cottonseed, which was field damaged, faulty, unsound, moist, and not in good condition, thereby breaching their said contract." The difference in value, that is, a part of the price advanced, is the amount sought to be recovered. The seed was sold after being rejected to lessen the damages.

The defendants filed a plea of privilege to be sued in Montgomery county, their place of residence and business. The plaintiffs controverted the plea, alleging, in effect, that the defendants had agreed to perform the agreement in Harris county. Subject to the plea of privilege the defendants answered the suit, averring, in substance, that the sale and purchase of the car of cottonseed was outright and fully consummated in Willis, Montgomery county, Tex.; that the cottonseed was to be, and was, "sound cottonseed of the current crop," to be. delivered, as was done, f. o. b. the car at Willis, Tex., for the sum and price of $48 per ton; that the car arrived at Houston in good condition; that plaintiffs paid the draft and received the bill of lading on September 14; that the cottonseed was not unloaded from the car until September 20 through unreasonable and negligent delay, causing the seed to be damaged. The plea of privilege and a trial on the merits were heard at the same time, the plea of privilege being overruled and a judgment on the merits being entered in favor of the defendants.

The jury made the findings of fact substantially: (1) That the defendants loaded the cottonseed in the car at Willis on September 12, and that they were in good sound condition at the time, and were in good sound condition "when the car arrived at Houston on September 14"; (2) that the parties to the contract intended that delivery of the car of cottonseed was to be made "at the mill of

⚙═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the plaintiffs in Houston, Tex. (meaning for the purpose of ascertaining weight and quality, the gross price to depend on weight and quality)"; (3) that the railway company and the plaintiffs were both negligent in the handling of the car of seed "after its arrival in Houston on September 14," but that the proximate cause of the damage to the cottonseed was the negligence of the railway company, "after the arrival of the car in Houston," in delaying the placing of the car for unloading on the industrial track at the mill of the plaintiffs.

Willis is about 49 miles from Houston. The carload of cottonseed was shipped from Willis on September 12, 1923. The bill of lading recites, as pertinent: "Received at Willis, Texas, September 12, 1923, from Willis Gin Co. Consigned to order of Willis Gin Company. Destination Houston, state of Texas. Notify Fidelity Cotton Oil Company, Houston, state of Texas. One carload bulk cottonseed."

The plaintiffs are successors of "Fidelity Cotton Oil Company." The bill of lading was indorsed, "Willis Gin Co., by W. R. Malone." Attached to the bill of lading was a sight draft drawn by the Willis Gin Company on the Fidelity Cotton Oil Company, Houston, Tex., for $1,133, being 90 per cent. of the value of the cottonseed, and including the freight charges. The bank in Houston notified the appellants of the draft "on the afternoon of September 14," and they paid the draft and received the bill of lading. The car of cottonseed arrived in Houston on September 14, and the railway agent notified the appellants "of the arrival of this car," as testified by appellants, "on the afternoon of the 14th of September." Further, as testified by appellants, "the bill of lading was delivered by us to the railroad company on the morning of the 15th, and receipt taken from the railroad company for that particular bill of lading on the morning of September 15." The car of seed was placed by the railway company on the track at the mill of the appellants late in the day of September 18th for unloading. In the inspection of the car on the morning of September 19th the appellants found the cottonseed in damaged condition. The value of the cottonseed in the damaged condition, less freight, was $221.80 per ton at Willis, aggregating $583." As testified by appellants:

"Our plant is in the city limits of Houston, about 15 minutes' ride out on Washington avenue on the G. H. & S. A. Railroad. It is not on the I. & G. N. R. R. This car was billed to Houston, notify Fidelity Cotton Oil Company. Usually when billed that way we get the cars from the carrier that brings them to Houston by a switch movement. We are in the city limits of Houston, and the car would be moved over by switch, and the Southern Pacific would deliver it to us. I don't think the Belt & Terminal has anything to do with that. The I. & G. N. would have to switch it to the Southern Pacific, and the Southern Pacific would take it to us from that transfer point. Our plant is located in the switching limits. * * * The car was in Houston from the 14th until the 19th. It was the 19th before we saw it."

It was shown by the witness Renz:

"In a contract which provides for the delivery of a cottonseed shipment at Houston, Tex., it is not necessary that there should read into that contract delivery at the mill of the purchaser, because if it states 'Houston' it is going to the mill of the purchaser without any action on the part of the mill company, as the railroad is going to deliver it to the mill. That is the custom in our trade. All the seed I buy is delivered 'Houston,' and they (the railroad company) come to my mill upon surrender of the bill of lading. It is not customary for the seed to be weighed and inspected before the car is placed at the mill on the industry track. We do not go outside—we only inspect the shipment on our premises when the car is tendered on the mill track. * * * The particular shipment to shipper's order we have to surrender the shipper's order bill of lading and get the receipt which is here shown me. * * * The custom would govern that the destination or point of delivery is on our mill track, and that the shipper guaranteed weight and quality at destination."

The witness Harris testified:

"During September, 1923, and before, there was a generally well known and universal custom throughout the state of Texas in the cottonseed trade that a delivery under a general contract of shipment, as involved in this suit, was to be made at destination (referring to the town) and at the mill of the customer. * * * I have never seen a ginner or shipper that did not know that it was the custom to deliver sound seed at the mill; that has been the general custom for 25 years. * * * You go around, pay the draft, and take the bill of lading as soon as the car gets to Houston (meaning after notice of the arrival of the car in the yards), and the—I mean to tell you it is the custom of the cottonseed trade, on up until the time the car is to be unloaded at the mill or warehouse the ginner or shipper is still responsible for the delay—after you have taken up the draft and the bill of lading it is the custom for the ginner to take the responsibility until it is delivered—good sound seed—at the mill."

The defendants testified, substantially, that they had been shipping cottonseed for many years, and they did not know of any custom or usage of delivering the shipment "at the mill" of the purchaser; that they had shipped to various purchasers at Houston; and that they had always made the destination of the car "Houston," as in this instance; that there was an outright sale of the seed for cash at Willis; that they "did not inspect the seed involved in this case, only it ginned all right."

There is evidence to support the findings of the jury, and in deference to their verdict such findings are here accepted.

Baker, Botts, Parker & Garwood, of Houston, for appellants.

Huggins, Kayser & Liddell, of Houston, for appellees.

LEVY, J. (after stating the facts as above). The appellants contend that the court should have entered judgment in their favor upon the jury findings, for the damages sued for, resulting from the failure of appellee to deliver the quality of cottonseed agreed upon. It is argued that, as found by the jury, as the cottonseed were in a damaged and unsound condition when the car reached "the mill" of the appellees, where the parties intended the weight and quality of the cottonseed should be ascertained, the appellants were entitled to sue and recover the damages of the appellees on the contract, notwithstanding the proximate cause of the damage to the cottonseed was the negligence of the railroad company in delaying the placing of the car on the industrial track running by the mill of appellees, "after the arrival of the car in Houston," for there had been no acceptance by appellants of the shipment. The appellees, residing in Willis, Tex., forwarded by railway a carload of cottonseed to appellants, doing business in Houston, Tex., with delivery to be made at Houston, Tex. The agreement was that the cottonseed was to be "sound, dry, clean, and in good condition." The price was based on weight and quality. The cottonseed was "damaged" and not in a good state at the time the car reached "the mill" of appellees in Houston, due to negligence of the railway company. The agreement was verbal, and the understanding of the parties is not free from uncertainty. The appellees claim there was a completed sale of the cottonseed at Willis. The appellants claim that the understanding and intention of the parties was that the cottonseed was to be in a deliverable state at "the mill" in Houston, and the weight and quality there be ascertained as a determined quantity, the price being dependent upon weight and quality. In order to show the intention of the parties in their dealings, evidence was introduced, the understanding being ambiguous, as to usage of the cottonseed trade. Such usage in real meaning was, in case there was not an outright completed sale of cottonseed at the gin, and a carload of cottonseed was forwarded by the ginner by railway to a mill company at a distant place, the weight and quality of the shipment was to be ascertained at the mill of the buyer and the gross price then determined. It was further shown that the cotton mills in Houston were located in the city limits, on industrial tracks which were owned and used by the railroads for placing carload shipments for final delivery and unloading.

[1, 2] The rule is that when a universal custom is shown to have existed having origin in the sale, the transaction is prima facie presumed to have been on that basis, the parties not having specially contracted otherwise. If the understanding of the parties is made with reference to such custom, intending such custom to be a part of the agreement, the custom is binding and renders the seller liable for loss or damage resulting from failure to conform to it, and excuses him when loss or damage is not attributable to an observance of it. In such case the intention of the parties is a question of fact for the jury.

[3, 4] Therefore, accepting the special finding above of the jury, the understanding and intention of the parties was that the place of sale was to be "at Houston." The buyers' place of business, and not the seller's residence, and that to determine the aggregate price of the seed the buyer was given the privilege of testing by weight and inspection the shipment at the buyer's "mill at Houston." The terms were to be "cash," and a part of the price to become payable by draft at time of shipment, to be credited on the bill. Parties may so agree, in liberty of contract. This is in legal effect a contract of sale on a condition precedent, and the sale becomes incomplete until the buyer has determined that the shipment is as contracted for, or he has had a reasonable opportunity to do so. In this view the judgment should have been in favor of appellants upon the jury findings, unless such findings were eliminated by further findings the court was authorized to make under the pleading and evidence. It is claimed that the appellants by their acts changed and modified the place and manner of delivery by accepting the shipment while the car was in the yards of the railway company and before it was placed on the track running by the mill of the appellees. It is argued that the law attached to the acts of the appellants the legal consequence of passing title to the cottonseed to appellants, and therefore the appellees were not responsible for the damage to the shipment. The circumstances offered in support of this contention were that the appellants paid the draft and took the bill of lading duly indorsed and attached to the draft, and delivered the bill of lading to the railway agent, taking his receipt therefor. The appellants never had actual access to the car while it was in the general yards of the railway company, as the railway company itself was holding the car for delivery on the track by the mill.

[5, 6] The appellants had access to the car only after the railway company had placed it for delivery and unloading on the track by the mill. The appellants timely inspected the car after delivery was made by the railway company on the mill track, and, finding the cottonseed not in good sound condition, they promptly notified the appellees of rejection of the shipment because of the condition of the cottonseed. The seed was afterwards sold in

order to lessen the damages. It is difficult to say that the mere fact that the appellants paid the draft and secured the bill of lading for delivery to the railroad company while the car was yet in the railroad yards at Houston would constitute a delivery and acceptance of the shipment. It would have been necessary that appellants should have done this with the intention of accepting the shipment. Acceptance implies the actual taking with the intention of retaining. And the circumstances point to the one conclusion that appellants did not intend to take and retain the shipment while the car was in the general yards of the railroad company. The bill of lading was delivered to the railroad agent, and receipt taken in lieu thereof temporarily, solely for the purpose and object of furthering, under methods and practices of the railroad companies, the placing of the car on the industrial tracks, in virtue of, and not independent of, the contract with the appellees. It was contemplated that the practice of the railroad company should be followed in respect to switching and placing carload shipments on a track for ultimate delivery and unloading, the delivery of the cottonseed not being complete, as pertains to appellees' contractual duty, when the car reached the general yards of the railroad company.

[7, 8] It is true, ordinarily, that the transmission and delivery of the bill of lading passed the property in the shipment to the buyer. The buyer can sell the shipment, pledge or hypothecate it, or divert the routing elsewhere. In such case the buyer would have put it out of his power to comply with the agreement with the seller. Even so, none of those acts appear in this case as evidencing intention of absolute acceptance in the general yards of the railroad company. And always, as between the buyer and the seller, in the absence of change or modification of place and manner of delivery, the title and risk remain in the seller until the shipment is delivered in accordance with the terms of the contract, the intention of the parties so appearing. 'It is of legal significance that the quality of the cottonseed, "sound and dry," at the special point of delivery was, under the contract, a condition precedent to the transfer of the property in the shipment. Unless the cottonseed was in a state in which it ought to be accepted, although the appellants had taken and retained the bill of lading, the performance of the agreement failed, and appellants could refuse to receive the shipment, as done, and sue for the price advanced, as in the nature of money had and retained.

[9] There is no evidence from which the court would be at liberty to find a waiver. It may be that the appellants could have maintained a suit against the railway company had they so elected to do. Robinson & Martin v. Railway Co., 146 S. W. 537, 105 Tex. 185. But the appellants could elect, as they did do, to sue appellees only for the resulting damages in virtue of the contract. The Robinson & Martin Case, supra, is not opposed to such course. No particular case in point has been cited to us. The general principles applicable to the facts are well understood. It is incumbent upon us to render the judgment that should have been rendered in accordance with the verdict of the jury. Accordingly the judgment is reversed, and judgment is here entered on the findings of the jury and the undisputed evidence of value in favor of appellants for $550, with legal interest from September 18, 1923. Costs of appeal are taxed against appellees.

[10] We think the venue was in Harris county as determined by the trial court, and appellees' assignment of error in that respect is overruled.